# ARKANSAS STATE BOARD OF PHARMACY
## v. S. W. PATRICK

5-4350                                        423 S. W. 2d 265

Opinion delivered January 29, 1968

*Warren & Bullion,* for appellant.

*Brown, Compton & Prewett,* for appellee.

CARLETON HARRIS, Chief Justice. This appeal relates to the revocation of the license of S. W. Patrick to practice pharmacy in the state of Arkansas by the Arkansas State Board of Pharmacy. Patrick was charged with, and found guilty on, two counts of violating the pharmacy laws of Arkansas. After a hearing before the board, wherein evidence was taken, that body found that

Patrick had violated the pharmacy laws, and that such violations were sufficient to justify the revocation of his license to practice pharmacy in this state. An order of revocation was thereupon entered on February 16, 1966. Patrick appealed to the Union County Circuit Court. That court, upon review of the record made before the board, found that the decision was unsupported by material and substantial evidence, and reversed same. From this judgment of the Circuit Court, the State Board of Pharmacy brings this appeal.

Administrative procedures were complied with, and no objection has been raised by appellee as to any irregularity.

Ark. Stat. Ann. § 72-1040 (Supp. 1967) sets out the grounds for revocation of a pharmacist's license, Item 8 of that section being the basis of the first charge against Mr. Patrick. That item provides for revocation or suspension when it is found "that said person has willfully violated any of the provisions of the pharmacy laws of the state of Arkansas." The law which it is contended was violated is found in Ark. Stat. Ann. § 82-1115 as Subsection (k), this provision having been adapted from the Federal Food, Drug and Cosmetic Act, and containing essentially the same language (21 U.S.C. 353 [b] [1] [B]). In *Dugan Drug Stores, Inc.* v. *United States,* 326 F. 2d 835, it was held that the dispensing of a potentially harmful drug without authorization by a prescribing physician constitutes misbranding.

The facts relied upon by the board in entering its order are as follows:

Paul A. Rush, a special investigator for the board, had been given a package by Mr. Woodrow T. Little, Chief Inspector of the State Board of Pharmacy, the package (container) bearing a label, this label showing the name of Mrs. Nancy Henry, such name being fictitious. The label indicated that Dr. R. L. Turnbow, who had given permission for his name to be used, had pre-

scribed for Mrs. Henry, though, of course, this had not happened. This procedure was part of a general investigation, and Rush testified that he was to contact every store in the area.

On December 29, 1964, Rush walked into the Medic Pharmacy in El Dorado, where appellee was pharmacist, and handed to Patrick the container, which bore a Walgreen label, the label indicating that it had contained[1] tablets of Enovid, which had been dispensed (as set out in the preceding paragraph) to Mrs. Nancy Henry on the basis of a prescription by Dr. Turnbow. Enovid E is a legend drug, meaning that it requires a prescription[2]. Rush told Patrick that he had been sent by a lady to get it refilled; appellee accepted the container from Rush, and sold him another container, containing 20 Enovid tablets, Patrick affixing a Medic Drug Store label No. 185622, indicating that the tablets had been dispensed on a prescription by Turnbow to Mrs. Henry. Someone[3] in the drug department then wrote a prescription for Mrs. Henry for 20 tablets of Enovid E, signed Dr. Turnbow's name to it, and appellee signed his name as dispensing pharmacist in compliance with the regulation of the board which requires a pharmacist who fills a prescription to attest that he has personally filled the prescription.

Appellee testified that he did not recall the transaction desiribed by Rush, though the prescription did bear his signature.

---

[1] The container, in fact, still contained one Enovid tablet.

[2] Donald W. Stecks, Secretary of the Board of Pharmacy, testified that "a legend drug is controlled by the Food and Drug Act and bears the statement to be dispensed only on a physician's prescription or a doctor's or a dentist or a veterinarian." Mr. Patrick himself agreed that it was a drug requiring a prescription.

[3] The board asserts that the prescription was written by Mrs. Sue Hughes, unlicensed to practice pharmacy, an employee of the drug store. This assumption is apparently based on the fact that Mr. Gene Porter, owner of the drug store, denied that he wrote the prescription, appellee stated that he did not know who wrote it, and it subsequently developed that Mrs. Hughes had written a similar prescription, which will be hereafter discussed.

He said that Dr. Turnbow was a specialist in Obstetrics and Gynecology:

"* * * The date on this is September 14th. He came in in December then it was within his time limit. I don't remember whether I actually filled it and if I did I probably tried to call Dr. Turnbow. If I don't try to call them then on these situations we call them later and get their OK because Turnbow and Rainwater are particular about their prescriptions. They want to check them. I probably tried to call Turnbow and didn't get him. As far as this incident concerning the prescription, I don't recall. * * I think a druggist is entitled to use his professional judgment to know that a pill of this sort or drug of this sort has to be taken regularly it wouldn't be like making the patient run down to the doctor and get a proper prescription when it is explained to you what type of drug it is. There was no doubt as to what it was and knowing Dr. Turnbow and knowing that he gives them for a year at a time I wouldn't hesitate to fill it."

On February 2, 1965, Rush again went to the Medic Pharmacy, taking with him the container which had been given him in December by Patrick. This was presented to Mrs. Hughes, employed in the store at that time. According to Rush, Mrs. Hughes filled the prescription, typed the name on the label, placed the label on the package, and handed it to him. Appellee was in the drug store at the time, but there was no consultation between Mrs. Hughes and Patrick,[4] and Rush stated that, as far as he knew, the act by Mrs. Hughes was performed without knowledge of appellee. However, the prescription was signed by Patrick, and was offered as an exhibit in the case. The aforementioned facts constitute basically the evidence upon which the board acted.

[4] The packages and labels in both instances were introduced into the record as exhibits.

The Circuit Court found that "the evidence does not⁵ sustain the board's finding that Mr. Patrick dispensed 20 tablets of Enovid E without a proper prescription therefor.

"However, the evidence also shows that he did this as a result of a 'trap' set by the very board which acted as judge at his hearing. The evidence shows that an employee of the Board was given a packet containing one Enovid tablet (which the evidence shows is primarily a 'birth control' pill) with another drugstore's label on it and with a prescription number and a doctor's name on it. This employee then took this packet to Mr. Patrick and asked for a refill. Of course, no prescription had been given for the pills in the first place and this was simply a 'trap' or 'test' to see if Mr. Patrick would refill what he was led to believe was a genuine prescription."

The court was somewhat critical of this procedure, but it is, under the circumstances of this case, completely legal, and the practice is frequently followed in enforcing the law. In *Sorrells* v. *United States,* 287 U. S. 435, in an opinion by Chief Justice Hughes, the United States Supreme Court said:

"It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. [Citing cases.] The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law."

⁵The "not" in the transcript has been scratched through in ink, and a question mark placed behind the word, and this finding of the judge is accordingly not clear. The abstract also includes the "not," but the second sentence indicates that it has been stricken.

Of course, evidence as to violations of the liquor and narcotic laws is frequently obtained by officers who are "undercover" men, and who employ deception in presenting an opportunity for those who may be engaging in illegal traffic. In *Sherman* v. *United States*, 356 U. S. 369, the court said:

"However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was the 'product of the *creative* activity' of law enforcement officials."

In *Dugan Drug Stores, Inc.* v. *United States, supra.* the United States Court of Appeals, Fifth Circuit, pointed out:

"The record shows that the agents did no more than present an opportunity for the violation of the Act by the sale of a prescribed drug without the necessary refill authorization."

Here, Patrick was simply presented the opportunity to violate the law without the necessary refill authorization. Mr. Rush used no persuasion; not in any manner did he induce Patrick to violate the law. There is no reason to believe that the same result would not have occurred if Rush had been a *bona fide* purchaser for a real Mrs. Nancy Henry, who had originally obtained her tablets, by prescription, from a Walgreen drug store. Under those circumstances, appellee, in selling the tablets, would have as surely been guilty of a violation of the law, as under the actual circumstances. It may well be that persons over the country, who have never obtained authorization (prescription) from a physician, acquire these tablets in just such a manner.

As to the second charge, it is contended that Patrick violated Item 5 of § 72-1040, which provides that grounds for revocation or suspension exist if the phar-

macist "has directly or indirectly aided or abetted the practice of pharmacy by a person not authorized to practice pharmacy by the Arkansas State Board of Pharmacy." Relative to this charge, the trial court said:

"However, aside from that, it also does not appear from the evidence that Mr. Patrick did anything that could approach aiding and abetting this lady, Mrs. Hughes, to practice pharmacy. In fact, the evidence does not even show that she practiced pharmacy. It is true that in response to leading questions there is assent at times by a witness to counsel's statement that Mrs. Hughes filled the prescription being inquired about but a close reading of the testimony convinces the Court that no witness really testified that he saw her do anything but put an already printed label on a container; and it is the Court's opinion that putting such a label on a container does not constitute the practice of pharmacy."

We disagree with this finding. Let it be remembered that without appellee's assistance in signing the prescription, Mrs. Hughes could not have sold the container and its contents to Rush, i. e., the drug could not be dispensed without a prescription, because, on inventory, the drugs dispensed must tally with the prescriptions on file. Mr. Patrick signed the prescription. In other words, appellee, though not the direct perpetrator of the prohibited act, yet rendered an act which aided the actual perpetrator. We think there is good reason for such a prohibition, and though nothing more is done than to place a label on a container, it is quite evident that some knowledge is necessary in order to place the *proper* label on the package. There are hundreds of drugs on the market at this time, and an erroneous set of directions could well result in the impairment of a customer's health. It is true that there is a difference between the act performed by Mrs. Hughes, and the compounding or mixing of a preparation called for by a prescription. Nonetheless, we think the public welfare demands that the dispensing of drugs, including the giving of directions, be performed only by an authorized pharmacist.

974

While we are of the view that there was substantial evidence to support the findings of the board that Patrick had violated the law relating to the practice of pharmacy, we think the punishment administered was too severe. Act 103 of 1963 provides uniform administrative procedures for occupational and professional licensing boards and commissions, including Arkansas State Board of Pharmacy, and prescribes a uniform procedure for taking appeals. Section 19 of that act provides that the court may modify the decision of the board, *inter alia*, if it finds same to be "arbitrary or capricious."[6]

We have concluded that the board, in fixing the punishment herein, acted arbitrarily in the sense that the judgment was extremely harsh, and unreasonable, under all of the facts. Though the evidence reflects that Patrick has been a practicing pharmacist for 28 years, the transcript does not reveal any blemish (except the present charge) on his record. While he certainly did wrong in pursuing the course of action complained of, it may well be true that he had every intention of calling Turnbow, but when other matters intervened, overlooked it. He apparently was familiar with the practice of that doctor in prescribing the particular type of tablet involved. At any rate, we think that, to permanently bar an individual from the profession that he studied and prepared himself for, and has practiced for many years, apparently in a law-abiding manner, requires proof that makes it clearly evident that that individual had embarked on a calculated course of willfully violating the law. That has not been established in this case. We think also that it must be recognized that there is a difference in dispensing Enovid, and in dispensing barbiturates

---

[6]Act 434 of the General Assembly of 1967, which deals with the same subject matter, expressly repeals Act 103 of 1963, and in the section entitled "Judicial Review of Adjudication" Subsection (h) provides that the court may modify the decision if it finds that same was "arbitrary, capricious, or characterized by abuse of discretion." This indicates that the General Assembly considered that these terms have quite similar meaning. The present case, of course, was subject to the provisions of Act 103 of 1963.

and narcotics. It is our view that, under the evidence cited, Patrick should be suspended from practicing pharmacy for the period of one year. Certainly, this should be sufficient to impress upon the mind of this appellee, and others who may have been careless in dispensing drugs, that the laws relating to the practice of this profession must be observed.

Accordingly, it is the order of this court that the judgment of the Union County Circuit Court be, and hereby is, reversed, and the cause is remanded to that court with directions that it enter its judgment requiring the State Board of Pharmacy to enter an order in conformity with this opinion.

FOGLEMAN, J., dissents in part.

JOHN A. FOGLEMAN, Justice, dissenting. I concur in the opinion of the majority that, in view of the nature of the offense, the absence of any showing that the violations by appellee constituted a pattern of conduct and the apparent unblemished record of appellee, the punishment imposed by appellant seems unduly harsh and severe. It seems so much so, that I feel we are justified in saying that the penalty imposed shocks the conscience of the court, and, thus, constitutes arbitrary action on the part of the board. The Wisconsin court reached such a conclusion in reviewing the revocation of the licenses of real estate brokers by the Real Estate Board. *Lewis Realty, Inc. v. Wisconsin Real Estate Brokers' Board,* 6 Wis. 2d 99, 94 N. W. 2d 238 (1959). The action there was taken under the Administrative Procedure Act of Wisconsin, Chapter 227, Title XVIII, Wisconsin Statutes (1963). The provisions of that act on the scope of the circuit court review and appeal to the supreme court are strikingly similar to the act applicable here. §§ 227.20 and 227.21, Wisconsin Statutes (1963). In that case, the court reversed and remanded one license revocation to the trial court with directions to remand the case to the board for proceedings to determine the length of time for which the license was to be suspended and

approved a previous remand of another by the trial court. I feel that we should remand this cause to the circuit court with directions to remand to the board for reconsideration of the penalty to be imposed.

I humbly submit that the action of the majority in fixing the penalty has extended the power and jurisdiction of this court beyond the limits prescribed for review of actions of administrative agencies. I further submit that the boundaries set are particularly appropriate when the agency in question is charged with the responsibility of regulating a particular business, occupation or profession. The scope of our review is governed by Act 103 of 1963.[1] Section 22 of that act provides that a party may appeal from the circuit court under rules applicable in other civil cases. This does not give us the power to hear the matter *de novo* upon the record, as is the case when appeals are taken from a circuit court review of the Arkansas Commerce Commission. See *Fisher* v. *Branscum*, 243 Ark. 516, 420 S. W. 2d 882. The statute governing those appeals, unlike Act 103, requires that we review all the evidence and make such findings of fact and law as we deem just, proper and equitable. Ark. Stat. Ann. § 73-134. In *Arkansas State Board of Pharmacy* v. *Gibson Products Co.*, 239 Ark. 584, 390 S. W. 2d 628, the holding that we would review decisions of this board de novo was based upon a statute that required the circuit court to review the case de novo. Ark. Stat. Ann. § 72-1029 (Repl. 1957). This part of that section was superseded by Act 103 of 1963, in which the scope of circuit court review is much more limited.

If we treat this matter as we would any other appeal in a civil case, it seems obvious to me that we would remand the case to the trial court, unless our decision only left one course of action to be taken, in which event we would render judgment here or direct a specific judgment. See *Longer* v. *Carter*, 102 Ark. 72, 143 S. W. 575

---

[1] While this act was repealed by Act 434 of 1967, § 16 of that act provides that the repeal should not apply to pending proceedings.

(on rehearing); *Combs* v. *Bunn W. Robertson, Inc.*, 205 Ark. 20, 166 S. W. 2d 665.

I think it far more desirable that the State Board of Pharmacy decide on the penalty to be imposed in this case in the light of the court's action in reversing. That board is composed of five experienced pharmacists. Ark. Stat. Ann. § 72-1002 (Repl. 1957). It is more likely to know the effectiveness of penalties than any court. It is my feeling that a one year suspension prescribed by this court is virtually a slap on the wrist for one who has falsely certified the issuance and filling of a prescription. It would be no more difficult to do the same if the "prescription" were for narcotics or any other drug. The record clearly shows that appellee has left the state and is plying his trade in Louisiana. I have been unable to find any Louisiana statute that even authorizes, much less requires, suspension there on reciprocity. We cannot assume that his suspension here will have any effect in that state, so appellee might possibly sit out this suspension there and later return to Arkansas without any interruption in his practice of pharmacy at all.

I would either remand the case to the circuit court for further proceedings under Act 103 of 1963, or with directions to remand to the board for appropriate action, preferably the latter.